[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a suit for dissolution of marriage brought by the plaintiff wife against the defendant husband. The parties were married on August 23, 1975 in Southport, Connecticut. There are three minor children issue of the marriage, Tyler Brant Richardson born March 14, 1979, Nicholas Lunsford Richardson born January 15, 1983, and Lyman Cooper Richardson born December 7, 1985, thus 17, 13, and 10 at present. The children have been represented by Attorney Wayne Effron. While the parties had reached an agreement on the issues of custody and visitation, the court, nevertheless, deemed Attorney Effron's representation throughout the trial to be in the best interests of the children. See § 46b-54 (c).
The parties separated in November, 1994. The plaintiff continues to reside in the family home in Southport with the three children. The defendant is residing temporarily at a home rented by his parents at 12 Godfrey Road in Westport. He indicates in his financial affidavit that he will have to obtain a permanent residence and assume additional shelter expenses "within the next six months."
The plaintiff commenced this action on December 5, 1994 by writ, summons and complaint seeking a dissolution, temporary and permanent alimony, temporary and permanent child support, temporary and permanent custody of the minor children, attorney's fees, experts' fees and an equitable division of the parties' real and personal property. The defendant has filed an answer and cross complaint admitting the allegations of the plaintiff's complaint and seeking a dissolution, joint custody of the minor children, and such other relief as the court may deem proper. The parties have filed a stipulation that the marriage has broken down irretrievably.
There has been difficulty in this marriage over the years dating back to 1981. There were many disputes and differences, including disputes over money. The plaintiff complained of the defendant's aloofness, lack of attentiveness and that there was excessive wine drinking on defendant's part. The defendant CT Page 5496-BB complained that the plaintiff was confrontational, that she berated him, and that her demands of him as a father and husband were excessive. The court finds that the personalities of each of the parties and the difficulty which they have had in communicating have contributed to the breakdown of the marriage and that each is equally at fault for the marital breakdown.
The plaintiff is 40 years of age. She was 19 when the parties were married. She has been a caring and good mother to the parties' three children and their primary caretaker. At the time of the parties' marriage she had been a student at Princeton for six months. She did not have an opportunity to finish college until the children were older. She took courses at the University of North Carolina, Fairfield University and the University of Bridgeport receiving a B.A. degree in Elective Studies in 1986. She worked in a pottery shop the first year of their marriage. In 1990-1992 she ran her own decorating business. She earned $7,000 in the year 1990 and $7,000 in the year 1991. She has worked as a substitute teacher at Greens Farms Academy, has done volunteer work, and renovated the homes owned by the parties during their marriage.
In 1992, the plaintiff became very ill and was hospitalized. She was diagnosed as having myasthenia gravis (Lou Gehrig's disease). She underwent thoracic surgery for the removal of her thymus gland. The onset of her physical problems occurred in May, 1992. She was operated on in October, 1992. Her medication today consists of 5 mg. of prednisone every other day. The disease is in remission at the present time.
While the plaintiff is unable to do heavy physical work (she has household help three days per week and a laundress one day per week), she is able to drive, to do grocery shopping and normal household chores. She has been to Singapore and Australia on a two week trip with a male friend, a trip to Italy for a week, and a trip to the Bahamas for a long weekend, all in 1996. She devotes a lot of her time and energy to the three boys, is involved in their after school activities, and their activities at the Country Club of Fairfield and Pequot Yacht Club. The defendant has a membership at Country Club of Fairfield and the parties have a joint membership at Pequot.
In 1993, the parties sold their home on Hulls Farm Road in Southport and purchased their present home at 1000 Harbor Road in Southport. The purchase price was $1,150,000. The defendant CT Page 5496-CC valued the property at $1,250,000 in his testimony and his financial affidavit, while the plaintiff valued the property in her financial affidavit at $1,150,000. It is subject to a first mortgage of $308,834, a home equity line of $45,102 and a sewer assessment for $9,210. The monthly expense for the mortgage, real property taxes, hazard insurance, home equity loan and sewer assessment amounts to $5,262, an annual amount of $63,000. There is considerable maintenance needing to be done that has been deferred during this litigation.
The parties first owned a house in Easton in 1978. This property was sold three years later. They then bought a house in London when the defendant worked for Richardson-Vicks and, on their return from London, they sold the London house and bought the house on Hulls Farm Road for $420,000. The Hulls Farm Road property was sold in two parts, the house sale and the land sale. Half of the proceeds of the land sale was deposited to the plaintiff's personal investment account.
At the time of their marriage, the plaintiff had no assets and no liabilities. During the marriage, her father died and she inherited $60,000. The plaintiff has received gifts over the years from the defendant's parents, a $100,000 gift from the defendant and half the proceeds from the sale of the Hulls Farm Road land sale, as noted above, so that her personal investment account now totals $229,000. She has an IRA account of $29,000 and personal savings of $4,000.
The defendant is 43 years of age. He is a graduate from the University of North Carolina at Chapel Hill with a Bachelor's degree in Sociology and a Master's degree in Business Administration in 1978. Upon graduation from college, he worked as a salesman for Richardson Vicks for the years 1973 and 1974. After receiving his MBA, he returned to Richardson Vicks for two years, working in marketing. He worked in London for three and a half years, also in marketing, and then returned to corporate headquarters. The company was sold two years ago and the defendant then became President of the Smith Richardson Foundation and Chairman of the Trustees of the Bald Mountain Trust and the H. Smith Richardson Trust.
The offices of the Foundation are located in Westport and Greensboro, North Carolina. Richardson Vicks Corporation was founded by the defendant's great grandfather, Lundsford Richardson, the inventor of Vicks Vaporub. His son was H. Smith CT Page 5496-DD Richardson. The descendants of H. Smith Richardson are listed in the family tree attached as exhibit B to the defendant's financial affidavit. H. Smith Richardson had five children, one of whom is H. Smith Richardson, Jr. who has had six children, one of whom is the defendant. There were 53 descendents of H. Smith Richardson alive at the time of his death ranging in age from 25 to 86 years.
The defendant is the life beneficiary of four trusts. He has no control over the income or principal of these trusts. The only power that he enjoys is a special power to appoint by will under three of the trusts (see plaintiff's exhibits D, E and Q). The fourth trust is set forth in plaintiff's exhibit F. A summary of all trusts in which the defendant has or may have any interest is contained in plaintiff's exhibit S. Those trusts are also listed in the defendant's financial affidavit either as the income trusts set forth above, the four trusts listed in the footnote on pages 2 and 3 and the trusts listed in Schedule A.
The defendant receives $103,000 per year in trust income. As President of the H. Smith Richardson Foundation, the defendant receives an annual salary of $243,495, a bonus of $6,000 and annual director's fees of $12,000. His total gross annual income is $369,707, a net income after all withholding of $251,291 (19.983 x 12 + $11,495 of expenses paid by Piedmont).
A central issue in this proceeding is the defendant's interest in these several trusts all created by members of his family for the benefit of their descendants. None are grantor trusts created by the defendant. Except for the four trusts noted, the defendant's interest is one of a number of actual or potential beneficiaries. He has no legal right to receive principal from any of the trusts in question. He has received only one principal distribution, that in the amount of $200,000 made in May, 1990 for the purpose of a real estate investment known as Old Black Point in which he has a one-third interest. This principal distribution required the approval of the two trustees and two officers of Piedmont Financial.
Because the defendant has no current right to receive principal from any of the trusts and because he cannot control the distributions of the corpus of the trusts, this court cannot consider the principal values of the trusts as assets belonging to the defendant. Tremaine v. Tremaine, 235 Conn. 45, 65-66
(1995). As to the defendant's opportunity for future acquisition CT Page 5496-EE of capital assets and income from these trusts, this can be no more than an expectancy and also not to be considered in this case. Rubin v. Rubin, 204 Conn. 224 (1987); Krause v. Krause,174 Conn. 361 (1978).
The defendant called as a witness Ms. Patti Goad, a sixteen year employee of Piedmont Financial Co., Inc., account administrator and assistant secretary of the corporation. Piedmont Financial is the corporation administering all of the family trusts and Ms. Goad was the individual with whom the parties communicated with respect to these accounts. Ms. Goad also testified that Piedmont Financial has in place numerous safeguards and procedures which preclude any beneficiary from compelling invasions or discretionary distributions of principal and income. The plaintiff's testimony to the contrary is not supported by any evidence.
The plaintiff has argued that the defendant may assign or pledge his interests in the trusts. Either the trust instrument itself or applicable state law preclude the defendant from alienating his interests. As to the trusts which contain specific clauses of inalienability, see plaintiff's exhibit D, Article Sixth, page 7, plaintiff's exhibit E, Article Sixth, pages 8 and 9, and plaintiff's exhibit Q, Article Fifth, page 6. All of the other trusts set forth in plaintiff's exhibit S (the trusts' summary) do not expressly prohibit alienability. However, since the defendant's right to principal and income in all of the other trusts, if any, is discretionary, his interests are not alienable as a matter of law. These other trusts, plaintiff's exhibits F, C, G, H, I, K, N, O, P, R, L and M, are all governed either by Connecticut or North Carolina law.
Under North Carolina law, specifically section 36a-115 of the North Carolina Statutes, a beneficiary's interest in discretionary trusts is not alienable. (See defendant's exhibit 1.) Under Connecticut law, if the terms of the trust reserve total discretion in the trustee or trustees as to distribution of income or principal, the vested interest is not alienable.Carlisle v. Carlisle, 12 Conn. L. Rptr. No. 16, 535, 536 (Stamford, Harrigan, J. 10/21/94) citing George Gleason Bogert and George Taylor Bogert, The Law of Trusts and Trustees, Section 181 (rev.2d ed. 1979). In valuing the defendant's estate, the trusts have no value whatsoever to the defendant except for his income interests. CT Page 5496-FF
In considering all of the criteria of § 46b-81 and §46b-82 of the General Statutes, it must be noted that the defendant's health is good. There has been no medical proof that the plaintiff is unable to work. As previously noted, she has worked in the past. She has testified that she has no intention of working, but if she were "forced on the street", she would have to work. The only evidence of her productive capacity is the $7,000 annual profit from her decorating business in 1990 and 1991.
It should also be noted that the plaintiff's characterization of the defendant's control and management of the Bald Mountain Trust was contrary to the evidence. The Old Black Point property investment, based upon the evidence, has, for the defendant's one-third share, declined in value from $167,000 to $108,333.
The parties have reached an agreement with respect to custody and visitation which essentially adopts the recommendation of the Family Relations' report (see plaintiff's exhibit A). As stated upon the record, the parties have agreed there shall be joint legal custody of the three minor children, but that the day-to-day decision-making, as well as final decision-making authority upon issues of conflict between the parties with regard to the children, shall be granted to the plaintiff mother. Physical custody shall be with the plaintiff. Visitation for the oldest child, Tyler, age 17, shall be completely at his discretion as agreed upon between Tyler and his father. Visitation with respect to Nicholas (Nico) and Lyman shall be Wednesday evening for dinner and every other weekend. With respect to Lyman, it shall be in his discretion whether it shall be an overnight visitation.
While it was not agreed upon, the court shall order that holidays shall be divided between the parties as they shall agree. Should there be any difficulty in this regard, the parties shall return to court for further orders. There shall be no order with respect to counseling for the parties or the children at the present time.
The court finds that these orders are in the children's best interests at the present time. See § 46b-56 of the General Statutes.
The parties have also reached an agreement regarding the education of the children. This has been signed by the parties and all counsel and provides that the defendant shall see to it CT Page 5496-GG that the private schooling for each child and college education for each child is paid. The court has examined this stipulation, approves the same and, pursuant to the provisions of § 46b-66
of the General Statutes, shall incorporate the same by reference into this decree.
In determining the issue of support, the court must be guided by the provisions of § 46b-84 and § 46b-215b of the General Statutes. Section 46b-215b provides that the child support guidelines shall be used in determining the amount of support. The income of the defendant exceeds $1750 per week. In such instance, support shall be on a case by case basis, the amount of support prescribed at the $1750 per week level shall, however, be the minimum presumptive level which, based upon the guidelines is $572 per week. See § 46b-215a-2 (a) of the Child Support Guidelines Regulations.
To be considered under the provisions of § 46b-84 (c) is the amount and sources of income and estate of each of the children in addition to those other factors of age, health, station, occupation, educational status and expectation, vocational skills, employability and needs of the child. The children are all students at Greens Farms Academy, Tyler in the eleventh grade, Nico in the seventh grade and Lyman in the fourth grade. Their grandfather has paid for their schooling. It was planned that they would spend the summer in activities at the Country Club of Fairfield and Pequot Yacht Club in Southport. There are three generation skipping trusts for each of the children, each with a principal value of $49,000 (see plaintiff's exhibits U, V, and W). Income in each of these trusts is being accumulated. In addition, Tyler and Nico each have a life interest trust in which the income is being accumulated. These have been funded by annual gifts to all grandchildren by the defendant's parents. The plaintiff and the defendant also have received annual gifts of $20,000 each from the defendant's parents.
A difficult issue to resolve is that of continued health insurance for the plaintiff. The defendant has solved this issue by his suggestion in his supplemental request to charge. Following the issuance of this decree, the defendant will continue coverage for the plaintiff under his current medical insurance policy in place from the defendant's employer pursuant to COBRA and the provisions of § 38a-538 for thirty-six months. The plaintiff, if she takes steps necessary to ensure any CT Page 5496-HH pre-existing conditions are covered by the Connecticut Reinsurance Association, can do so so long as said coverage is in effect for one year. Thus, if she has coverage under Connecticut Reinsurance for the last twelve (12) months of the COBRA period, she will be covered thereafter for any pre-existing condition. (See plaintiff's counsel's letter of July 10, 1996 attached to plaintiff's trial memorandum and plan description of Connecticut's Special Health Care Plan.)
It should be noted that the defendant presently has in effect two life insurance policies, one with Massachusetts Mutual Life Insurance Company in the amount of $1,500,000 and one with Northwest Mutual Life Insurance Company in the amount of $2,976,400. Each policy is presently payable to an insurance trust for the benefit of the plaintiff.
The plaintiff seeks an order of unallocated alimony and support of $20,000 per month ($240,000 per year) reducing in the year 2006 (the year following the eighteenth birthday of the youngest child) to $15,000 per month ($180,000 per year). In the alternative, $18,000 per month apportioned $12,000 support for the three minor children and $6,000 alimony.
By way of temporary alimony and support, the defendant has been paying the mortgage, insurance and taxes totalling $5,262 and has been depositing $10,978 per month into a joint checking account for use by the plaintiff. The plaintiff, however, claims this is considerably less than she was receiving while the parties were living together and that she has had to reduce her personal investment account from $350,000 to $229,000 or roughly $120,000. She also testified that she had spent $180,000 of her own funds since November, 1994.
The plain truth of the matter is that there is not sufficient income to meet plaintiff's request and permit the defendant to have sufficient money for his own living expenses.
While counsel for the children has requested that the plaintiff be permitted to remain in the house on Harbor Road in Southport for the sake of the children and the plaintiff has requested the house with the mortgage and home credit line paid off by the defendant, the defendant's income, while generous, is not great enough to continue to carry the financial burden of the $5,200 monthly charge for the mortgage, insurance, taxes and home equity loan plus alimony and support for the plaintiff and the CT Page 5496-II children.
With respect to alimony, support and the division of property of the parties, the law to be considered has been stated as follows:
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 487, 271 A.2d 42
(1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' (Citation omitted.) Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and sources of income, assets and opportunity for future acquisitions of assets of each of the parties, (citation omitted), no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530
(1980); Watson v. Watson, 221 Conn. 698, 710 (1992).
In the case of Blake v. Blake, 207 Conn. 217 at 230 (1988), our Supreme Court cited with approval the language of O'Neill v.O'Neill, 13 Conn. App. 300 at 311 (1988), in which our Appellate Court stated as follows:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities. CT Page 5496-JJ
The court has considered all of the criteria of §§ 46b-81
and 46b-82 of the General Statutes together with all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v.Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman,188 Conn. 232, 234 (1982).
Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and that the court need not give equal weight to each factor. Kane v.Parry, 24 Conn. App. 307, 313-14 (1991).
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true.
3. There has been an irretrievable breakdown of the marriage.
4. Each of the parties is equally at fault for the breakdown of the marriage.
The court enters the following orders:
1. A decree of dissolution of marriage shall enter on the grounds of irretrievable breakdown of the marriage, the same to enter on the plaintiff's complaint.
2. There shall be joint legal custody of the three minor children. The day-to-day decision making as well as the final decision making authority to resolve all issues of conflict between the parties with regard to the children is granted to the plaintiff. The plaintiff shall have physical custody. Visitation for the oldest child, Tyler, shall be at his discretion as agreed upon between Tyler and the defendant. Visitation with respect to Nico and Lyman shall be Wednesday evening for dinner and every other weekend. CT Page 5496-KK However, overnight visitation for Lyman shall be in his discretion. Holidays shall be divided between the parties as they shall agree. Should there be any difficulty between the parties in this regard, they shall return to court for further orders.
3. The stipulation of the parties with regard to the children's education shall be incorporated by reference in this decree. The court enters orders in accordance with that stipulation.
4. The defendant shall maintain medical insurance for the minor children and shall pay all uninsured and unreimbursed medical and dental expenses incurred on behalf of the children for so long as he is obligated to pay support provided, however, that no psychiatric, psychological, orthodontic expenses, or elective surgery or treatment shall be incurred without his prior consent, which consent shall not be unreasonably withheld. The plaintiff shall have the benefit of § 46b-84 (d) of the General Statutes.
5. The defendant shall continue to maintain medical insurance for the plaintiff's benefit currently in place from his employer under the provisions of COBRA and the provisions of § 38a-538 of the Connecticut General Statutes at his expense for the maximum period provided by law or until the plaintiff's earlier remarriage.
6. During the COBRA period and before the end of twenty-four (24) months, the plaintiff shall take all necessary steps to be covered by the Connecticut Reinsurance Association policy. During the final twelve (12) months of the COBRA period, the plaintiff shall also be insured under the Connecticut Reinsurance Association policy if necessary to qualify any pre-existing conditions. The defendant shall pay the premiums for said policy during said twelve (12) month period unless, during this period, the plaintiff has remarried. After the thirty-six month period of COBRA coverage, the defendant shall continue to pay the premiums for the Connecticut Reinsurance Association policy or any other comparable policy until the plaintiff's remarriage, cohabitation as defined by the provisions of § 46b-86 (b) or her eligibility to be covered by Medicare, whichever first occurs.
7. The defendant shall pay to the plaintiff unallocated alimony CT Page 5496-LL and support in the amount of $12,500 per month commencing October 1, 1996 and payable on the first day of each month thereafter until the earliest to occur of the following events: the date that the real property known as 1000 Harbor Road, Southport is sold, the plaintiff's death, remarriage, cohabitation as defined by the provisions of § 46b-86 (b) of the General Statutes, or the nineteenth birthday of the parties' child Nico. If terminating at the date the property is sold, unallocated alimony and support shall continue in the amount of $15,000 per month to commence on the first day of the month following said sale, terminable upon the aforesaid events except sale of the property. If unallocated alimony and support is terminating because of the plaintiff's remarriage or cohabitation as defined, the parties shall confer to arrive at a fair and reasonable amount by way of support for the minor children. If unallocated alimony and support is terminating because Nico has reached his nineteenth birthday, the parties shall confer to arrive at a fair and reasonable amount by way of alimony and a fair and reasonable amount by way of support for Lyman.
 The parties shall return to court for appropriate orders with or without an agreement regarding alimony and support or support only. It is contemplated by this order that the plaintiff shall have lifetime alimony terminable only by her death, remarriage or cohabitation as hereinbefore defined.
8. So long as the plaintiff receives unallocated alimony and support for the three children, she shall be entitled to claim the children as dependents for income tax purposes. For that period when the defendant is no longer responsible for Tyler's support and the unallocated order has not reduced, she shall be entitled to claim the two minor children as dependents for income tax purposes.
9. a. The real property at 1000 Harbor Road, Southport, shall be placed upon the market for sale. It shall be placed upon the market for sale by both parties. The contract for sale shall provide for a closing date no sooner than July 1, 1997, and until the property is sold, the plaintiff shall be entitled to remain in exclusive possession of the premises with the three minor children. The listing price shall be set by the defendant, and the defendant shall have exclusive authority to accept any offers for the sale of the CT Page 5496-MM property together with any terms or conditions upon the sale of the property. The parties shall agree upon the listing realtor or realtors and any agreement with regard to commission shall be the decision of the defendant.
 b. Pending sale of the property, whenever it shall be, the defendant shall pay the mortgage, hazard insurance, interest on the credit line, real property taxes and sewer lien. All other expenses except maintenance shall be borne by the plaintiff. The plaintiff shall be responsible for all ordinary maintenance including lawn care, snow plowing and yard maintenance. Any extraordinary repairs defined as any single expense in excess of $200 shall be paid by the defendant. Any fix-up expenses or repairs suggested by the realtor for sale of the property shall also be the obligation of the defendant.
 c. The defendant shall be reimbursed for one-half of such expenses from the proceeds of sale and for the other half out of the plaintiff's share of the net proceeds as hereinafter provided.
 d. From the proceeds of sale, the mortgage, home credit line and real property taxes shall be paid together with the customary closing adjustments, the realtor's commission and a reasonable attorney's fee. Thereafter, one half of the amount expended by the defendant for extraordinary repairs or fix-up expenses shall then be paid.
 e. From the proceeds thereafter remaining, the sum of Six Hundred and Sixty-five Thousand Five Hundred ($665,500) Dollars shall be paid over to the plaintiff as a division of property pursuant to the provisions of § 46b-81 of the General Statutes.
 f. The plaintiff shall reimburse the defendant for one-half of the cost of extraordinary repairs and fix-up expenses incurred by him from her share of the proceeds. The balance of said proceeds after payment to the plaintiff shall be paid over to the defendant.
g. It is contemplated that the unequal distribution of the CT Page 5496-NN net proceeds of sale will result in as nearly as possible equal division of the parties' assets and liabilities.
 h. Each of the parties shall be responsible for one-half of the taxes incurred upon the sale, both federal and state.
10. The plaintiff shall keep, retain and possess, free of any claim or demand by the defendant, the following property:
a. her jewelry;
 b. the furniture, furnishings and household effects at 1000 Harbor Road, Southport, Connecticut, except for such personal items that the defendant claims to be wholly his including articles of clothing, all of which shall be made available to him within thirty (30) days of this date;
 c. her personal investment accounts as disclosed in her financial affidavit in the approximate amount of $229,191;
d. her IRA in the approximate amount of $29,345;
 e. the joint PMA account at People's Bank in the approximate amount of $54.00;
 f. her personal savings account in the approximate amount of $4015;
 g. her household checking account in the approximate amount of $524;
 h. the amount indicated in her father's estate in the approximate amount of $6043;
 i. her savings for checking in the approximate amount of $41.00;
 j. the 1995 Acura Legend automobile and the 1991 Ford Explorer automobile.
The automobiles are jointly owned. The defendant shall CT Page 5496-OO execute those documents necessary to transfer all of his right, title and interest to the plaintiff. This is also true of any joint bank accounts if so required.
11. The defendant shall keep, retain and possess, free of any claim or demand by the plaintiff, the following property:
 a. such tangible personal property that is in his possession;
 b. such personal effects and clothing that is referred to in paragraph 10(b) above;
 c. his interest in citrus groves located in Dade County, Florida with an approximate value of $61,775;
 d. his one-third interest in Old Black Point Associates partnership owning unimproved land in Niantic, Connecticut with an approximate value of $108,333;
 e. his Lexington Money Market Fund with an approximate value of $4900;
 f. his Bankers Trust checking account with an approximate balance of $3,000;
 g. his securities account with an approximate value as of May 15, 1996 of $352,284;
 h. his cash in securities account as of May 15, 1966 of $53,879;
i. his IRA account with an approximate value of $4598;
 j. his bond of Country Club of Fairfield in the approximate amount of $22,000;
 k. his TIAA-CREF account with a value as of March 30, 1996 in the approximate amount of $280,827.
12. The plaintiff shall be wholly responsible for her liabilities except for her liability as stated to Attorney Wayne Effron, her liability to Columbia Presbyterian Hospital and Spain ticket reimbursement for which the defendant shall be responsible. As to all other liabilities, she shall CT Page 5496-PP indemnify and hold harmless the defendant from any claims or demand thereon.
13. The defendant, if he has not done so, shall reimburse the plaintiff for her Spain ticket referred to in her financial affidavit, and shall pay the Columbia Presbyterian Hospital bill. The amount claimed by the plaintiff as owed to Attorney Wayne Effron is hereinafter provided for.
14. The court finds the statement for services of Attorney Wayne Effron to be fair and reasonable and allows an additional fee for his representation of the minor children in the amount of Eight Thousand Three Hundred Fifteen ($8,315) Dollars which shall be paid by the defendant, the same to be paid within thirty (30) days from the date hereof.
15. Having considered the provisions of § 46b-62 and § 46b-82 of the General Statutes, the court orders that the defendant pay to plaintiff's attorney the sum of Twenty Thousand ($20,000) Dollars. The court has considered this award in its division of assets under the provisions of § 46b-81 of the General Statutes.
16. The defendant shall maintain life insurance in the amount of $1,500,000 naming the plaintiff as irrevocable first beneficiary and the children as secondary beneficiaries for so long as he is obligated to pay alimony or until further order of the court.
17. The defendant shall designate the plaintiff as the guardian of the estates of the children in equal shares as the beneficiary of his life insurance policy with Northwest Mutual until such time as the youngest child attains age 18 or graduates from high school, whichever event last occurs.
18. The parties have executed a waiver of the provisions of § 52-362 of the General Statutes so that the court enters a contingent order for wage withholding to secure the orders herein for alimony and support.
Judgment having been entered on the plaintiff's complaint, plaintiff's counsel shall prepare the judgment file.
Orders shall enter in accordance with the foregoing. CT Page 5496-QQ
EDGAR W. BASSICK, III, JUDGE